IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 16-03054-01-CR-S-MDH Case No. 16-03054-02-CR-S-MDH |
| LARRY L. SANDERS *et. al.*, | ) ) | |
| Defendants. | ) | |

## REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. Defendants Larry Sanders ("Sanders") and Denia Richardson ("Richardson") move to suppress any and all evidence or statements derived as a result of a stop on January 2, 2016, including: the warrantless frisk and search of Sanders; the warrantless seizure and search of the bag found in Sanders's pocket; the warrantless search of Sanders's vehicle, a black 1998 Chevy S10 truck; the warrantless search of Richardson's purse and seizure of any items located in her purse; and the seizures of any items located in the vehicle as fruits of the poisonous tree. (Doc. 42, 47 and 55.) The undersigned held a hearing on the suppression issues on June 21, 2017. (*See* Docs. 63 and 65.) Sanders was present with his attorney, Ian Lewis, and Richardson was present with her attorney Bob Lewis. The Government was represented by Special Assistant United States Attorney Jody Larison. (*Id*.) During the hearing, the Court heard testimony from Derrick Hughston and Matt Foster, Deputies with the Howell County, Missouri Sheriff's Office ("HCSO") at the time of the events at issue. For the reasons set forth below, it is **RECOMMENDED** that Defendants' Motions to Suppress, (Docs. 42, 47 and 55), be **GRANTED**.

## I.  Findings of Fact[1]

On January 2, 2016, Deputies Hughston and Foster were conducting a saturation patrol of Howell County, Missouri looking for DWI and traffic infractions. At approximately 11:48 PM, they were traveling north on State Route 80 when they passed Union Grove Church and observed two vehicles, a truck and a white passenger car, sitting stationary in the church parking lot. The vehicles were parked side by side with the driver doors facing each other. Because of his knowledge of a prior burglary at the church, Deputy Hughston turned around at the next available location and headed back towards the church. Although only a few moments had passed before the deputies returned to the church, both vehicles were no longer there. Suspicious of the quick departure, Deputy Hughston continued down the highway looking for the vehicles. He observed two sets of taillights traveling down County Road 6620 and turned down the road to follow the vehicles.

As they approached, Deputy Hughston observed that the two vehicles were the same ones he had seen parked at the church. The truck, a black Chevy S10 pickup, was in the lead, followed by a white passenger car, which was later determined to be a white Chevy Impala.[2] When the vehicles braked to turn a corner, the deputies observed the truck's rear tail lights emitting a white light instead of a red brake light. Believing that the brake lights were improperly wired, Deputy Hughston initiated his emergency lights to make a traffic stop of the

---

[1] The facts set forth herein are taken from the testimony adduced and the exhibits admitted at the hearings on the instant Motion to Suppress. The hearing transcript appears as Doc. 65. The Government's exhibit index appears as Doc. 64. Defendant did not move to admit any exhibits during the hearing.

[2] The Court notes that the record is not clear at what point the deputies recognized the Impala. Deputy Hughston testified he was aware that an individual with prior narcotics-related arrests who had been the subject of investigations for methamphetamine distribution owned a white Chevy Impala with black rims and no hubcaps. (Doc. 65 at 6:5 – 7:4.) He also testified that he believed that the car he observed on the night of the January 2 was "consistent with" this individual's vehicle. (*Id.* at 9:2.) However, despite this specific knowledge, this information does not appear in his report. (*Id.* at 41) When asked why the information about the Impala did not appear in the deputies' report, Deputy Hughston testified that "[at] the time he observed the vehicle, I couldn't confirm that it was hers." (i.e. the known drug suspect) (*Id.* at 41:22) He also testified that he "did not find it pertinent" to include the information in the report and that he did not discuss this information until he was preparing for this hearing. (*Id.* 41-47). Deputy Foster testified that Deputy Hughston told him he was turning around because he was suspicious of the vehicles being present at the scene of a prior burglary. (*Id.* at 72:4) It does not appear that Deputy Hughston ever advised Deputy Foster that he recognized the Impala or its occupants, or that he had any suspicions of drug related activity before Deputy Foster encountered the Impala.

2

truck. The driver of the Impala slowed, but did not yield or pull over; instead, the car moved to the left of the center line. Believing the car was attempting to block the patrol car from getting around it, Deputy Hughston turned his driver's side spot light on and saw the driver of the Impala check her driver's side mirror multiple times. He initiated his siren and the Impala moved over, allowing Deputy Hughston to pass but still requiring him to enter the ditch line to get around the vehicle. As the patrol car pulled up behind the truck, the driver pulled over with no delay. The Impala pulled up behind the patrol car and came to a stop.

While Deputy Foster made contact with the occupants of the Impala, Deputy Hughston approached the truck and made contact with the driver, Sanders, and passenger, Richardson, the defendants in this case. Deputy Hughston asked both occupants for identification and obtained Sanders's proof of insurance. He then asked Sanders to get out of the truck and step to the front of the patrol car. He observed that Sanders was wearing blue jeans and a denim jacket with pockets. Deputy Hughston asked Sanders for consent to search his person. Sanders made no statement and put his arms out to the side. Deputy Hughston asked whether Sanders was giving or denying consent, at which point Sanders stated he did not consent. Based on the time of night, the location of the stop on an unlit county road, the suspicious nature of the Impala's driving and the fact that it had pulled up behind the patrol car, Deputy Hughston asked Sanders whether he had any weapons. Sanders initially replied that he did not have any weapons on him, but moments later admitted he had a pocket knife. Sanders removed the knife and placed it on the hood of the patrol car. Deputy Hughston asked Sanders if he had any more weapons. Sanders replied he did not. Deputy Hughston advised Sanders he was going to conduct a frisk of Sanders's person. At that point, Sanders became upset and accused Deputy Hughston of harassing him. Because Sanders failed to initially disclose the pocket knife and became negative when advised about the frisk, as well as the late hour and suspicious activity with the other

3

vehicle, Deputy Hughston was concerned that Sanders may have additional weapons on his person and began a frisk of him for officer safety.

Deputy Hughston patted the outside of Sanders's pockets and felt a large bulge in Sanders's front left pant pocket. He asked Sanders about the bulge, and Sanders replied it was money. Deputy Hughston continued the frisk and observed the "reflection of a bag" in Sanders's left coat pocket and "could not describe it" but could "tell that it was a clear and plastic." When Deputy Hughston asked Sanders about the bag, Sanders made no statement. Instead, Sanders reached towards his left coat pocket with his left hand, at which point Deputy Hughston removed the plastic bag and Sanders lunged for the knife, grabbing the knife with both hands.[3] Deputy Foster grabbed Sanders's hands and took the knife. Deputy Hughston asked Sanders why he did that; Sanders remained silent. He searched Sanders pocket with his flashlight and then completed the frisk, finding nothing else on Sanders.

Deputy Hughston placed the bag, an empty clear plastic baggie, under the windshield wiper of the patrol car and asked Sanders to sit in the front seat. He then entered the driver's side of his patrol vehicle "to conduct the interview with [Sanders] and complete the forms for the stop."[4] Before doing so, Deputy Hughston asked Deputy Foster to test the bag for the presence of methamphetamine while he completed the paperwork for the stop. Deputy Hughston asked Sanders where he was going and Sanders replied that he was going to visit a relative. After conducting a field test, Deputy Foster informed Deputy Hughston that the baggie tested positive

---

[3] The Court finds the record is not clear regarding what Sanders did with his hands and the knife. Deputy Hughston testified that Sanders "began to enter into his left pocket" and simultaneously retrieved the knife. (Doc. 25 at 25:21-25) He also testified that Sanders appeared to be attempting to open the knife but he could not see clearly because of his positioning. (*Id*. at 52:23-53:4 ) Deputy Foster testified that when Sanders moved towards his pocket, Deputy Hughston pulled the bag out. (*Id*. 67:8-11) He further testified that Sanders grabbed the knife with both hands and that he was not sure what he intended to do but he did not give Sanders the opportunity to do anything with the knife because he took the knife away. (*Id*. at 66:25-67:5)

[4] The Court notes that although the Government argues in their briefing that Sanders behavior regarding the knife was an assault on the deputy, neither deputy testified that Sanders was placed under arrest for the alleged assaultive behavior or that they felt threatened by Sanders's behavior.

4

for the presence of methamphetamine. At this point, Deputy Hughston had completed the paperwork for the stop and asked Sanders to step outside the vehicle. Deputy Foster then conducted a probable cause search of Sanders, seizing the money Sanders had disclosed earlier, which totaled approximately $2,500.00, but finding nothing else.

While Deputy Foster conducted the probable cause search of Sanders, Deputy Hughston approached the truck where Richardson was still sitting in the passenger seat. Without asking any questions, he had her exit the vehicle and step to the front of the truck on the driver's side. She consented to a search of her person, and Deputy Hughston allowed her to empty her own pockets. Deputy Hughston believed he observed that one of Richardson's breasts appeared larger than the other and believed Richardson was attempting to conceal something under her clothing. When he asked Richardson about her clothing, she voluntarily pulled her shirt out and shook her top and bra, but nothing fell out. After the search was completed, Richardson asked if she could smoke a cigarette. Deputy Hughston asked her if the cigarettes were on her person. Richardson said they were not. Deputy Hughston asked if the cigarettes were in her purse or if her purse was in the truck. Richardson confirmed that her purse was in the truck. Deputy Hughston observed a large black purse with two carrying handles and an open top sitting in the passenger seat. Without asking any further questions, he reached through the driver side door across the driver's side seat, grabbed the handles of the purse and picked it up. He then asked her for consent to search the purse, at which point her demeanor drastically changed and she repeatedly informed him she would not give him consent to search the purse.

Deputy Hughston set the purse down on the driver's seat and turned to talk to her, leaving the driver's side door of the truck open. When Deputy Hughston looked back at the purse, he observed the stem of a glass pipe that he knew from his training and experience was consistent with that of a methamphetamine pipe sticking out of the top of the purse. Deputy Hughston

5

informed Richardson that he no longer needed her consent and began a probable cause search of the purse. He discovered a glass bubble for smoking methamphetamine with methamphetamine residue in it and a set of digital scales with a lot of methamphetamine residue on them. From his experience and training, Deputy Hughston knew that these items were consistent with possession and distribution of illegal controlled substances. After discovering the pipe and scales, Deputy Hughston informed Sanders and Richardson that he was going to conduct a probable cause search of the vehicle. During the search he discovered a black and yellow Dollar General bag that contained a vacuum-style zip lock bag with a large amount of a white crystal substance that tested positive for methamphetamine. Approximately four months later, this indictment followed. (Doc. 1.)

## II.     Conclusions of Law

The Fourth Amendment protects citizens from unreasonable searches and seizures by the government. U.S. Const. amend IV; *United States v. Va Lerie*, 424 F.3d 694, 701 (8th Cir. 2005). Generally, evidence found as a result of an unlawful search or seizure, and the fruits therefrom, cannot be used against a defendant and must be suppressed. *United States v. Riesselman*, 646 F.3d 1072, 1078-79 (8th Cir. 2011). However, searches conducted pursuant to established and well-delineated exceptions do not require a warrant and are thus not unreasonable. *Arizona v. Gant*, 556 U.S. 332, 338 (2009). Defendants argue that the frisk of Sanders, seizure and search of the clear baggie from his pocket, seizure and search of Richardson's purse, and search of Sanders's vehicle were unreasonable and not conducted pursuant to any valid exceptions to the warrant requirement. In response, the Government argues that the deputies had reasonable suspicion to conduct a warrantless frisk of Defendant Sanders for weapons, and probable cause to search the vehicle and Sander's pocket. Additionally the Government argues they had either consent or probable cause to conduct a warrantless search of

6

Richardson's purse based on the plain view of the glass smoking device or the methamphetamine discovered on Sanders. Finally, the Government argues they had probable cause to search Defendant Sanders's vehicle after finding contraband on Sanders's person and in Richardson's purse. The Court takes up the parties' arguments below.

**A. Frisk of Sanders was reasonable.**

Sanders first argues the warrantless detention and frisk of his person was unreasonable. During a routine traffic stop, a law enforcement official may examine a driver's license, ask about a driver's destination, request the driver to sit inside the patrol car or ask for consent to search. *United States v. Brown*, 345 F.3d 574, 578 (8th Cir. 2003); *United States v. Gill*, 513 F.3d 836, 845 (8th Cir. 2008). An officer may also conduct a protective search of a motorist for weapons if the officer has reasonable articulable suspicion that the person is armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 328 (2009); *Terry v. Ohio*, 392 U.S. 1, 27 (1968). Reasonable suspicion exists where a reasonably prudent man in the same circumstances would be warranted in the belief that his safety or that of others was in danger. *Id*.

Sanders does not contest that the Howell County deputies had probable cause to stop his truck based on a vehicle equipment malfunction. Rather, he contends the decision to detain and frisk him was unreasonable. He further agues, relying on *United States v. Glenn*, 152 F.3d 1047, 1048-49 (8th Cir. 1998), that the pat down was conducted arbitrarily, without cause to suspect he was a danger and solely because the deputy planned to place Sanders in his patrol vehicle to complete the traffic stop. The Court disagrees that Deputy Hughston's decision to frisk Sanders was unreasonable or that Deputy Hughston conducted the pat down solely because he planned to place him in the patrol vehicle. Unlike in *Glenn*, where the officer conducted a pat down immediately after the stop, but before he had any reason to suspect the driver was armed, Deputy Hughston's inquiry regarding weapons and his subsequent frisk for weapons were reasonable in

7

light of Sanders's change in answer regarding his possession of the knife and negative demeanor, the poorly lit location, the late time of the stop, the presence of the Impala that pulled up behind the deputies' patrol car during the nighttime stop, and the fact that the vehicles had been parked at a church that had previously been burglarized. *See United States v. Preston*, 685 F.3d 685, 689-90 (8th Cir. 2012) (noting case law that supports a protective pat down during a nighttime stop); *see also Glenn*, 152 F.3d at 1049 (noting case law the supports a protective pat down when an officer was outnumbered). The above factors taken together provided reasonable suspicion that Sanders may have been armed and thus a limited search for weapons was permissible.

### B. Seizure of the bag from Sanders's pocket was impermissible.

Although the frisk was warranted, Sanders contends that the resulting seizure of the bag from his pocket exceeded the scope of a *Terry* frisk for weapons, and illegally extended the traffic stop in violation of the Fourth Amendment. The Court agrees. The "sole justification" of a warrantless pat down is to ensure the safety of the officer, not to discover evidence of a crime, and must be "strictly limited" to the discovery of weapons. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *United States v. Roggeman*, 279 F.3d 573, 577 (8th Cir. 2002). A protective pat-down must "stay within the bounds marked by *Terry*" and be "reasonably designed to discover concealed weapons." *United States v. Hanlon*, 401 F.3d 926, 930 (8th Cir. 2005) (citing *Dickerson*, 508 U.S. at 373; *Roggeman*, 279 F.3d at 577). Thus, where an officer seizes contraband without properly determining the presence of weapons, the seizure is unlawful. *Id*.

In the present matter, Deputy Hughston improperly and unreasonably conducted a search for weapons when he removed the baggie from Sanders pocket. The case law is settled that law enforcement exceeds the scope of a lawful pat down when they continue to search or seize objects from a defendant's pocket although no weapon or threat to safety is identified. *See United States v. Craddock*, 841 F.3d 756, 760 (8th Cir. 2016) (finding the officer's seizure of a

8

key fob from defendant's pocket exceeded the scope of a *Terry* frisk for weapons); *Hanlon*, 401 F.3d at 930 (finding the seizure of the vial of methamphetamine was justified because the officer was unable to conclude whether the object he felt during the pat-down was a weapon); *United States v. Bustos–Torres,* 396 F.3d 935, 944 (8th Cir. 2005) (noting the officers did not "rummage" through the defendant's pockets and only seized the contraband after "properly frisking" the defendant for weapons); *Dickerson* 508 U.S. at 378 (finding the continued manipulation of defendants pocket and subsequent seizure of drugs was not justified after officer determined the pocket did not contain a weapon); *Sibron v. New York*, 392 U.S. 40, 65 (1968) (finding the *Terry* search unconstitutional because the officer "thrust his hand into [defendant's] pocket" to seize drugs without first feeling for weapons); *Terry*, 392 U.S. at 29 (emphasizing that the officer did not place his hands in the defendant's pockets or seize the weapons until after he had felt the firearms during the frisk).

Here, Deputy Hughston testified that he "had not even felt [Sanders's] coat pocket" before seizing the bag. (Doc. 65 at 51:13-22.) Instead of completing the frisk, he testified he removed the bag to look further into the pocket because he "believed that there may be something in that pocket that [Sanders] was trying to retrieve" and "wanted to ensure that there was nothing in there that was going to be jeopardizing [his] safety." (*Id*. at 26:10-16.) Deputy Hughston only needed to feel Sanders pocket to know whether it concealed a weapon. Instead, Deputy Hughston chose to seize the bag to look inside Sanders's pocket, which clearly exceeds the scope of a frisk for weapons under *Terry*.

The Government attempts to argue several factors created probable cause to search Sander's pocket and seize the bag but does not clearly articulate which warrant exception justified this search. Although the government never explicitly mentions the automobile exception, it argues that several factors supported probable cause to search the vehicle, and that

9

these same factors support probable cause to search Sander's pocket. (Doc. 51 at 7.) Even assuming the government relies on the automobile exception, the Court disagrees that the deputies had probable cause to search the vehicle prior to searching Sanders's pocket. Probable cause to conduct a warrantless search of an automobile exists where the facts and circumstances are sufficient for a person of reasonable caution to believe that contraband or evidence of criminal activity was present in the vehicle. *United States v. Walker*, 840 F.3d 477, 483 (8th Cir. 2016). It "must be based on objective facts that could justify the issuance of a warrant by a magistrate and not merely on the subjective good faith of the police officers." *United States v. Ross*, 456 U.S. 798, 808, (1982).

Neither the case law provided by the Government nor the testimony establishes that the deputies had sufficient facts to believe drugs were in the vehicle. Unlike in the cases cited by the Government, Deputy Hughston had not observed objective evidence of criminal activity before he frisked Sanders. *See United States v. Jones,* 535 F.3d 886, 890 (8th Cir. 2008) (probable cause to arrest suspect who matched suspect description and was found close in time and proximity to robbery); *United States v. Parham*, 458 F.2d 438, 439 (8th Cir. 1972) (probable cause to conduct a limited search of the vehicle for open liquor after stopping defendant for violating open liquor law and observing him attempt to hide something in his back seat). During the hearing, the deputies characterized the encounter as a traffic stop rather than an investigation of a crime, and, despite their suspicions, neither deputy ever asked any occupants of either vehicle why they were parked at the church or specifically questioned them about the burglary or possible drug activity.

At the time of the frisk, the deputies had witnessed two vehicles parked at a church late at night, which is not enough to support reasonable articulable suspicion of a crime, much less probable cause. S*ee Brown v. Texas,* 443 U.S. 47, 51 (1979) (finding defendant's presence in an

10

alley in an area known for drug crime was not enough to establish reasonable, articulable suspicion of a crime). Neither deputy could see the vehicles' occupants nor did they witness a hand to hand transaction or smell any unusual odors on their approach. *See United States v. Daniel,* 809 F.3d 447, 449 (8th Cir. 2016). In fact, Deputy Hughston testified that he could not confirm if the white passenger vehicle was the Impala that belonged to the known drug subject, and he did not know who the Impala's occupants were prior to his frisk of Sanders. Additionally, his specific knowledge of the Impala and any suspicions of drug activity was absent from his report. When cross examined about this omission, he testified that he did not find it "pertinent" to include this information. He also testified that he first revealed the information about the Impala and its possible relation to drug activity during his preparation for the suppression hearing. Further, Deputy Foster's testimony does not corroborate Deputy Hughston's suspicions of drugs or drug activity.

The absence of this information in the deputies' report, the inconsistency between the deputies' testimony as to the reason for and investigation during the stop, and the characterization of the stop as a traffic offense leads this Court to find Deputy Hughston's testimony of any suspicions of drug activity prior to his frisk of Sanders is less than credible. The record does not establish that either deputy could even "articulate something more than 'inchoate and particularized suspicion[s]'" at the time the bag was observed and seized. *Terry*, 392 U.S. at 27. Consequently, absent some more objective evidence of drug activity, such as the observation of a drug transaction or drug-like substance in the bag or conclusive identification of the Impala and its occupants, the money in Sanders's pocket and his sudden movement during the frisk are not sufficient to establish probable cause that drugs were in the vehicle or Sander's pocket. *See Craddock*, 41 F.3d at 759 (Even the presence of the suspect near a stolen vehicle coupled with his nervous behavior was not sufficient to establish probable cause that the key fob

11

the officer felt belonged to the stolen vehicle); *see e.g. Bustos–Torres,* 396 F.3d. at 943 (finding that an experienced narcotics officer could reasonably believe the defendant's vehicle was on the scene to buy drugs even though the officers could not see the actual drug transaction because they had already witnessed sufficient facts that supported ongoing drug activity in the area).

The Government nevertheless urges the Court to find that the plain view doctrine justified the seizure of the bag. During a protective pat down, an officer may not seize items other than weapons, unless the officer has probable cause that an item discovered by plain touch, or in plain view, is incriminating evidence. *Dickerson*, 508 U.S. at 377; *Craddock*, 841 F.3d at 759; *see also Bustos–Torres,* 396 F.3d at 944–45. In order to ensure against speculative seizures, probable cause cannot be based merely on a hunch, but hinges on whether the object is immediately identifiable as incriminating evidence. *Bustos–Torres,* 396 F.3d. at 945.

The Court is not convinced that either deputy believed the bag was immediately apparent as drug evidence when it was initially observed. First, when asked if he could describe the bag at the moment he first observed it, Deputy Hughston testified, "At that time, no, I could not describe it." (*Id*. at 24:19-20) Additionally, Deputy Hughston testified that he removed the bag to look in Sanders pocket to see "if anything was concealed *below* [the bag]" and "didn't know why [Sanders] was reaching for that pocket." (*Id.* at 51:8-12.)(emphasis added). Not only did he not know what was in Sanders's pocket, and could not say whether it was a weapon or drugs, he could not see or describe the contents of the bag. In fact, after the bag was removed, he did not observe anything in the bag. Even Deputy Foster testified that Deputy Hughston removed a clear bag from Sanders's pocket and that there "[did not] appear to be anything" in the bag at first look. (*Id*. 66:13-19.) It was not until Deputy Hughston removed the bag during an improper frisk for weapons and Deputy Foster further examined it by a field test that the deputies associated the bag with drugs.

12

Neither does the Court agree with the Government's proposition that the circumstances made the inherently innocent bag immediately identifiable as evidence of a crime. The cases cited by the Government in support of this contention are not persuasive. *See United States v. White*, No. 09-00250-01-CR-W-ODS, 2009 WL 4729004, (W.D. Mo. Dec. 4, 2009); *United States v. Pajari*, 715 F.2d 1378 (8th Cir. 1983). In *White*, officers were executing a narcotics related warrant and observed White, an individual known to one officer from previous drug encounters, moving from side to side and trying to get his hands into his waistband although handcuffed. *White*, 2009 WL at 1. Based on White's continued behavior, officers conducted a pat-down, and, only after feeling a foreign object in White's butt area and recognizing his butt seemed to be clenched, placed him on the ground, pulled his clothing up and observed a baggie between his butt cheeks. *Id*. at 3. The Court found that the pat-down search did not rule out whether the object was a weapon, which justified a further search, and the clear bag clenched between the defendants butt cheeks could reasonably be presumed to be contraband, which justified its seizure. *Id*. at 6. In *Pajari*, the officers had information from informants and knew they were dealing with a suspected major drug dealer. 715 F.2d at 1382. While approaching Pajari in his vehicle outside of his residence, they observed him reaching for his feet before he exited the car. *Id*. at 1384. During a protective pat-down, officers observed a clear baggie hanging from Pajari's boot that clearly contained a white substance. *Id*.

The facts in the present matter are distinguishable from the cases above. Deputy Hughston was not executing a warrant for narcotics based on probable cause, did not know Sanders, could not identify with certainty the Impala or its occupants, had not witnessed any specific criminal activity or been informed of any recent crimes in the area, had not identified any warrants or prior arrests, did not feel Sanders's pocket and identify an unidentifiable object or a drug-like substance during a frisk and did not observe any contents in the bag before and

13

even after it was seized. The Court cannot conclude that the bag, which neither deputy could describe and which had to be further searched to determine its presence for drugs was immediately apparent as contraband at the moment it was observed in plain view.

Based on the evidence before it, the Court concludes the deputies did not have probable cause to believe the vehicle contained drugs or that the clear plastic bag was immediately apparent as contraband at the moment it was observed. The seizure of the bag exceeded the scope of the *Terry* frisk and suppression of the baggie is therefore proper.[5]

### C. Warrantless Seizure of Richardson's purse, Search and Seizure of Items in the purse and in Sanders's Vehicle, and Richardson's Detention were unreasonable.

Both Defendants argue the warrantless search of Sanders's vehicle should be suppressed as fruit of the poisonous tree. Specifically, Sanders argues that the unconstitutional seizure and subsequent search of the baggie impermissibly extended the stop. In a separate motion, Richardson, relying on the arguments advanced by Sanders, argues the prolonged detention, the search of her purse and of Sanders's vehicle were all unreasonable. The Government argues that the warrantless search of the truck was based on probable cause or, alternatively, was justified by the plain view of the glass pipe in Richardson's purse, which followed a consensual encounter with Richardson. The Government further argues that Richardson lacks standing to challenge the search of the car.

As discussed above, the deputies did not have probable cause to search the vehicle at the time of the illegal seizure of the bag in Sanders's pocket. Where a "protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid and its fruits will be suppressed." *Dickerson*, 508 U.S. at 373; *see also United States v. Riesselman*, 646 F.3d

---

[5] The Government also attempts to argue that Sanders's movement toward the knife constituted an assault and would authorize a search incident to an arrest. However, the Government failed to elicit any testimony Sanders was arrested. Deputy Hughston testified he placed Sanders in the patrol car to complete the paperwork for the stop, suggesting he did not arrest Sanders or attempt to search him incident to such arrest. As such, the Court does not address this argument.

14

1072, 1078 (8th Cir. 2011). Whether evidence is the fruit of an illegal search or seizure depends on the "nexus between the constitutional violation and the challenged evidence." *Riesselman*, 646 F.3d at 1079. Evidence that is "come at by exploitation" of illegal police conduct must be excluded absent an act sufficient to "purge the taint" of the illegal act. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

As determined above, the seizure of the baggie from Sanders was unlawful. Prior to the seizure of the bag or the search of the truck, Deputy Hughston had not confirmed the identity of the Impala or it occupants and had no other probable cause basis to search the truck without a warrant. Thus, but for the improperly seized bag, the deputies did not have any reason to suspect drug activity or continue to detain Sanders. Prolonging the stop to continue to investigate the evidence of drugs, when such information came about only through the unlawful search of Sanders, was invalid. *Wong Sun*, 371 U.S. at 488; *see also Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015) (A seizure initially justified by a traffic stop becomes unlawful if it is "'prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation.")

It is apparent that the discovery of the drugs in the improperly seized bag tainted everything that followed. Deputy Hughston testified he completed the paperwork for the stop prior to exiting the patrol vehicle and encountering Richardson. Following the completion of the traffic stop, he did not articulate any reason to justify Richardson's continued detention. The facts establish that Deputy Hughston did not continue his investigation of the traffic stop when he requested Richardson exit the vehicle and consent to a search. His actions were colored by the improperly discovered drugs found on Sanders. Richardson's continued detention was therefore unreasonable because it was improperly prolonged. Nor does Richardson's encounter establish any attenuation that removes the taint of the unlawful seizure because it was not

15

consensual. Deputy Hughston's show of authority, Richardson's compliance and her request to smoke indicates she did not feel free to leave. *Terry*, 392 U.S. at 19 n.16. Further, not only did Richardson clearly deny consent to the search of her purse, its warrantless seizure from the truck was impermissible because it was not based on probable cause apart from the unlawful act and also followed Richardson's impermissible detention. Consequently, the search of Richardson's purse and the truck are inextricably tainted by the illegal discovery of the evidence in the improperly seized baggie and must be excluded as fruit of the poisonous tree.

As a final note, the Government argues that Richardson does not have standing to challenge the search of the vehicle. While a passenger ordinarily does not have standing to object to the search of a vehicle in which they have no reasonable expectation of privacy, a passenger can challenge the lawfulness of her detention and seek to suppress evidence seized as the fruit of that detention. *United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001); *see Rakas v. Illinois*, 439 U.S. 128 (1978).

In the present matter, Richardson was effectively seized when the officers stopped Sanders's vehicle. *See Brendlin v. California,* 551 U.S. 249, 255 (2007). The seizure became unlawful when the deputies unreasonably prolonged her detention. Further, the discovery of the incriminating evidence was not completely "independent and separate" from Richardson's illegal detention. *Green*, 275 F.3d at 700. In *Green*, the search of the truck was based on the driver's consent, which the Court determined sufficiently attenuated the discovery of evidence found in the car from the passenger's illegal detention. *Id*. In the present matter, Deputy Hughston expressly testified that he no longer needed Richardson's consent to search her purse and the vehicle only after he observed the pipe in her purse. Accordingly, the Court finds that Richardson's illegal detention and the seizure of her purse resulted in the discovery of the pipe, which was not independent or separate from the discovery of the contraband in the vehicle. *Id*.

16

Because the search and seizure of evidence in this case was not conducted pursuant to any valid exceptions to the warrant requirement of the Fourth Amendment, the evidence obtained as a result of this search, including any evidence or statements derived as a result of the search, must be suppressed as fruits of the poisonous tree. Granting both of Defendants' Motions to Suppress is appropriate.

### III. Recommendation

Accordingly, it is **RECOMMENDED** that Defendants' Motions to Suppress, (Doc. 42, 47 and 55), be **GRANTED** and the following evidence be suppressed: the clear plastic baggie, the money from Sanders's pocket, the glass pipe and scales, and the evidence discovered as part of the search of the vehicle, including the methamphetamine, and any other evidence or statements derived from the discovery of the baggie.

/s/ *David P. Rush*
DAVID P. RUSH
UNITED STATES MAGISTRATE JUDGE

DATE:  November 15, 2017